# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3177

_____

Faith Elsharkawy, as herself, in her individual capacity, and as Trustee for the Next-of-Kin of Jacob Monroe Letourneau-Elsharkawy, decedent

*Plaintiff - Appellant*

v.

Chisago Lakes School District Board of Education, a municipality; jointly and severally; Independent School District No. 2144, Chisago Lakes Area Schools, a municipality; jointly and severally, doing business as Chisago Lakes Schools; Dave Ertl, Principal, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in his individual capacity, only; jointly and severally; Jason Thompson, Associate Principal, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in his individual capacity, only; jointly and severally; Carrie Hoffman, Associate Principal, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in her individual capacity, only; jointly and severally; Jerilyn Mattson, Special Services Case Manager, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in her individual capacity, only; jointly and severally; Angela Christenson, School Psychologist, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in her individual capacity, only; jointly and severally; Shira Ben-Heim, Special Education Teacher, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in her individual capacity, only; jointly and severally; Leah Taylor, Special Education Teacher, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in her individual capacity, only; jointly and severally; Carter Vogt, Guidance Counselor, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in his individual capacity, only; jointly and severally; Laura Gustafson, School District Nurse, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in her individual capacity, only; jointly and

severally; Jane and John Does, in their individual capacities, only; jointly and severally

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: February 10, 2026
Filed: July 21, 2026

_____

Before LOKEN, L.R. SMITH, and STRAS, Circuit Judges.

_____

L.R. SMITH, Circuit Judge.

J.L.E., a freshman in the Chisago Lakes School District, tragically took his own life. J.L.E.'s mother, Faith Elsharkawy,[1] sued Appellees[2] alleging, among other claims, violations of Title V of the Rehabilitation Act of 1973,[3] the Americans with Disabilities Act of 1990 (ADA),[4] and Minnesota's wrongful death statute.[5] On

_____

[1]Elsharkawy sued in her individual capacity and as trustee for the next-of-kin of J.L.E.

[2]Appellees are the Chisago Lakes School District Board of Education; Independent School District No. 2144, Chisago Lakes Area Schools, d/b/a Chisago Lakes Schools (collectively, "the District"); Jason Thompson; and Carrie Hoffman. Several individually named defendants were voluntarily dismissed at the district court level.

[3]29 U.S.C. § 791, et seq.

[4]42 U.S.C. § 12101, et seq.

[5]Minn. Stat. § 573.02.

appeal, Elsharkawy argues that the district court[6] erred when it granted Appellees' motion for summary judgment on these three claims. We affirm.

## I. *Background*[7]

In 2015, J.L.E. transferred to a middle school in the District as a seventh grader. Because J.L.E. suffered from several longstanding health and learning disabilities, the District placed him on an individualized education plan (IEP). The District modeled J.L.E.'s IEP after those he had at previous school districts. The District also determined that J.L.E. was eligible for special educational services. Elsharkawy agreed with the District's academic plan.

J.L.E. frequently missed school, often due to his health conditions. As a result of J.L.E.'s absences, in January 2016, the District recommended that it provide him homebound educational services. Elsharkawy agreed with the District's recommendation. During homebound instruction, a District-hired tutor visited J.L.E. for five hours each week to help him with his homework and answer any questions he had. J.L.E.'s doctor and the District viewed homebound instruction as temporary. It was understood that J.L.E. should return to in-person instruction unless health concerns prevented his school attendance. Accordingly, after about a month, J.L.E. returned to in-person education.

J.L.E.'s frequent absenteeism resumed. This led to truancy concerns. During her deposition, Elsharkawy ascribed J.L.E.'s absences to his medical conditions. She testified that the District sometimes excused J.L.E.'s absences when he brought a

---

[6]The Honorable David S. Doty, United States District Judge for the District of Minnesota, now deceased.

[7]The district court's summary judgment order noted that Elsharkawy's summary judgment brief contained "inaccurate citations" and "exaggerated claims." R. Doc. 197, at 5 n.5. Elsharkawy's appellate brief contains much of the same. "Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense." *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007).

doctor's note but at other times the District would lose J.L.E.'s doctor's notes, resulting in unexcused absences. Elsharkawy acknowledged during her deposition that "sometimes when [J.L.E.] would seem stressed out with school . . . [she] would let him have a mental health day off." Appellees' App. 1604.

Before J.L.E. started eighth grade, the IEP team, including Elsharkawy, added more accommodations to his plan. The District also recommended that J.L.E. receive in-school counseling provided by Therapeutic Services Agency (TSA), a third-party counseling agency. Elsharkawy agreed with the District's recommendation. Additionally, J.L.E.'s IEP mandated that he could not enroll in art class until he completed his work on time for two weeks for his other classes.

During that school year, J.L.E.'s absenteeism, tardiness, and incomplete school assignments persisted. Elsharkawy believed that the District was responsible and accused it of not following certain aspects of J.L.E.'s IEP. For example, she believed that the District was not permitting J.L.E. to wear either his hat or hood, not allowing him to take naps as needed, not breaking down his assignments to a more understandable level, nor providing him with unlimited access to the bathroom and nurse. The District responded by reminding individual teachers of accommodations that J.L.E.'s plan required be made for him due to his disabilities.

J.L.E. also experienced behavioral and peer-related incidents while in school. Examples of these incidents included sleeping in class, including through exams; roughhousing with his peers; and arguing with teachers when they attempted to discipline him. He received several after-school and lunch detentions for his conduct. The District remained in contact with Elsharkawy regarding these issues. For example, J.L.E.'s special education teacher reached out to Elsharkawy to notify her that J.L.E. fell asleep "many times" at school. *Id.* at 217. The teacher made recommendations that she thought would improve J.L.E.'s sleeping schedule and asked if there was anything she could do to assist.

Unfortunately, J.L.E.'s classmates sometimes behaved inappropriately towards him. For example, in September 2016, some of J.L.E.'s classmates poked him with their pencils. Unaware of the initial aggressors' actions, the teacher verbally reprimanded J.L.E. when he retaliated. When Elsharkawy complained that J.L.E. was singled out for reprimand, the teacher responded by changing the seating chart and instructing the class on the value of respecting others. Other examples include a classmate tying J.L.E.'s shoelaces to a post on the school bus while he was asleep, a classmate breaking J.L.E.'s glasses on the school bus, classmates calling him names, and a classmate asking about his Muslim diet. In each of these instances, the District disciplined the offending student rather than J.L.E.

Elsharkawy became convinced that the District was not implementing J.L.E.'s IEP or his health plan. She also believed that the District's detention discipline practice negatively affected J.L.E.'s view of school. In May 2017, Elsharkawy requested a complete special education re-evaluation and a functional behavioral assessment (FBA). J.L.E. received the FBA to assess his educational needs but did not receive the special education re-evaluation. The FBA determined that J.L.E.'s conduct was "reinforced and maintained by attempts to gain peer attention and acceptance" and recommended that the District provide J.L.E. "additional supervision during passing time, teaching accepting feedback or criticism, following directions, and accepting decisions of authority." R. Doc. 28-1, at 29. The school year ended before the District could implement these recommendations.

On August 13, 2017, at Elsharkawy's request, the high school IEP team met to discuss J.L.E.'s needs and Elsharkawy's general concerns regarding bullying. The team explained the District's bullying policy and how J.L.E. could report bullying. J.L.E.'s case manager trained J.L.E.'s teachers and paraprofessionals on his IEP, including his various accommodations and health plan.

J.L.E. also experienced issues with some of his peers in high school. For example, on October 3, 2017, J.L.E. and his best friend, S.K., threw broken keyboard parts on the bus ride from school. They threw the pieces inside the bus and out of

the bus's window. This caused disruption on the bus, which led to an argument with another student, K.J. During the argument, K.J. put his hands on J.L.E.'s neck and threatened him. When J.L.E. got off the bus, he punched a mailbox in frustration. The mailbox recoiled and hit him, injuring his eye. The District investigated the bus incident. J.L.E. received two days of lunch detention for throwing the keyboard parts and was assigned to sit in the middle of the bus. The District suspended K.J. from the bus for three days and notified his parents of the incident. The District considered the incident not serious enough to warrant police involvement.

On November 8, 2017, a different student, O.O., threatened J.L.E. with violence. O.O. made the threat because he believed that he saw J.L.E. make a hand gesture simulating pointing a gun at his own head. The gesture upset O.O. because his father had recently committed suicide using a gun. J.L.E. denied making the gesture and was not disciplined for the incident. O.O. received a day of in-school suspension for the threat. Concerned that O.O. would follow through on his threats to harm J.L.E., Elsharkawy and J.L.E. met with the assistant principal, Carrie Hoffman. Hoffman spoke with teachers and learned that there had been no prior issues between J.L.E. and O.O. Hoffman planned to keep J.L.E. and O.O. separated in class and to increase supervision in common spaces like the lunchroom. The District also separated them on the bus by assigning J.L.E. to sit in the front and O.O. to sit in the back.

The next day, while on the bus ride from school, a student told O.O. that J.L.E. was talking about O.O.'s deceased father. O.O. walked to the front of the bus and punched J.L.E. multiple times and then returned to his seat in the back of the bus. That evening, Elsharkawy took J.L.E. to the hospital for his injuries. The doctor noted that J.L.E. suffered facial contusions and a head injury. J.L.E. missed several days of school after the incident.

Hoffman was in contact with Elsharkawy following the incident. The District investigated the incident and determined that J.L.E. was not at fault. Hoffman referred the matter to law enforcement for criminal charges; suspended O.O. from

school for five days; suspended O.O. from the bus until December 4, 2017; changed O.O.'s class schedule to decrease the likelihood of any contact with J.L.E.; and directed hallway and cafeteria supervisors to watch for any interactions between O.O. and J.L.E. and to respond immediately if an incident occurred. J.L.E. did not have any more serious issues with O.O., except for on January 29, 2018, when J.L.E. reported that O.O. "was giving [him] 'a death stare.'" *Id.* at 15.

The incident with O.O. made J.L.E. uncomfortable at school, leading to a substantial increase in his absences. Because of those absences, on November 30, 2017, the District told Elsharkawy that J.L.E.'s future medical-related absences would need to be accompanied by a doctor's note or would be considered unexcused. The District emphasized its interest in having J.L.E. attend school on a regular basis.

On January 3, 2018, the District notified Elsharkawy that J.L.E. had accrued five unexcused absences, which, according to county protocols, would lead to truancy intervention. The District concluded that J.L.E.'s inconsistent attendance jeopardized achievement of his IEP goals. The District informed Elsharkawy that it had other options for meeting J.L.E.'s educational needs, such as alternative or online school if she believed that such would be a better fit for J.L.E. The District also suggested adjusting J.L.E.'s IEP goals. Elsharkawy agreed to the IEP changes. J.L.E.'s attendance and grades then improved. J.L.E. also became more socially connected at school.

But as the year progressed, J.L.E.'s behavioral issues resurfaced. He was tardy to class, skipped detention, distracted classmates, slapped a classmate, was unfocused in class, and was defiant with teachers. Elsharkawy again expressed concerns that J.L.E.'s teachers were not following his IEP. J.L.E.'s special education teacher responded to the concerns by acknowledging the accommodations that he required and committed to reminding J.L.E.'s other teachers.

On February 2, 2018, Elsharkawy requested that J.L.E. not be disciplined until the IEP team met again. The District responded that J.L.E. was subject to the same

disciplinary procedures and code of conduct as the other students. This was consistent with his IEP. On February 12, 2018, the IEP team met with Elsharkawy. They made no changes to J.L.E.'s IEP.

In February 2018, Sheena Malm, J.L.E.'s TSA counselor, notified Elsharkawy that J.L.E. needed to complete a diagnostic assessment for continued counseling services. Malm "did not think [J.L.E.] had completed [his] treatment goals, and he was not in a place to be done with therapy." Appellees' App. 2110. Counselor Malm left Elsharkawy voicemails and sent an email. Elsharkawy never responded to schedule the assessment or to discuss J.L.E.'s need for continued counseling services.

J.L.E.'s situation became more serious on the morning of April 27, 2018. That day, Elsharkawy caught J.L.E. with cigarettes and her prescribed medication. J.L.E. went to school. After his arrival at school, he texted Elsharkawy saying that he would stab and kill himself because he was done with being alive. He told Elsharkawy that he needed a mental health day. Soon thereafter, he was tardy for class.

As J.L.E. requested, Elsharkawy picked J.L.E. up from school for a mental health day. Elsharkawy asked him if he needed psychiatric help. He said no. In her deposition, she testified that she did not think he was going to commit suicide. Elsharkawy grounded J.L.E. for stealing her medication. She testified that J.L.E. was not upset about being grounded.

Two days later, on Sunday, April 29, 2018, J.L.E. took his own life, leaving no note. His social life during the weeks leading up to his death revealed his difficulties coping. Specifically, he had mentioned killing himself multiple times to close friends and to his girlfriend. J.L.E. fought with his girlfriend throughout the weekend of his suicide.

The District denies awareness that J.L.E. was a suicide risk. Elsharkawy contends that the District was aware. According to Elsharkawy, counselor Malm told

S.K.'s mother that J.L.E. and S.K. were caught at school searching the internet for information regarding suicide methods about a week before J.L.E.'s death. According to S.K.'s mother, counselor Malm told her that school computers had software that notified the school of inappropriate content searches. S.K.'s mother also explained that counselor Malm told her that another student saw J.L.E. and S.K.'s computer search and reported it to the school. S.K.'s mother says that she did not report her conversation with counselor Malm to the District or discuss it with S.K. at the time. However, she says that S.K. confirmed the searches years later but described them as not serious and done for fun.

During his deposition, S.K. did not recall the searches. Counselor Malm denies that any student reported seeing J.L.E. and S.K. search suicide methods. She also denies being aware of any program that alerts District staff to inappropriate internet searches. Dean Jennissen, the District's corporate designee, confirmed during his deposition that prior to J.L.E.'s death, the District did not have a program that alerted staff to inappropriate internet searches.

Elsharkawy sued Appellees seeking damages for J.L.E.'s death. She alleged, in relevant part, that Appellees violated the Rehabilitation Act, the ADA, and Minnesota's wrongful death statute. The district court granted summary judgment in Appellees' favor on these claims.

Elsharkawy appeals the district court's judgment.

## II. *Discussion*

On appeal, Elsharkawy argues that the district court erred when it granted summary judgment in Appellees' favor on her Rehabilitation Act, ADA, and wrongful death claims. We disagree.

"We review the district court's grant of summary judgment de novo." *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018). We will affirm summary judgment when "the movant shows that there is no genuine dispute as to

-9-

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If there is a genuine dispute, we view the disputed facts in the light most favorable to the nonmovant. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). "We may affirm summary judgment for any reason supported by the record." *Gareis v. 3M Co.*, 9 F.4th 812, 818 (8th Cir. 2021).

## A. *Rehabilitation Act and ADA*

The Rehabilitation Act and ADA both afford protections for disabled individuals attending public schools. *A. J. T. ex rel. A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 339 (2025). Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Similarly, under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Prior to the Supreme Court's *A. J. T.* decision, the Eighth Circuit "appl[ied] a heightened intent standard to ADA and Rehabilitation Act claims concerning educational opportunities." 605 U.S. at 345. Specifically, we required plaintiffs to establish that the defendant acted in bad faith or with gross misjudgment. *Id.* But *A. J. T.* clarified that "ADA and Rehabilitation Act claims based on educational services should be subject to the same standards that apply in other disability discrimination contexts." *Id.* The Supreme Court reasoned that "[t]here is no textual indication that the protections of either disability discrimination statute apply with lesser force to *certain* qualified individuals bringing *certain* kinds of claims." *Id.*

Thus, post-*A. J. T.*, to establish a prima facie case under the Rehabilitation Act or ADA, a plaintiff must prove the following: (1) he is a qualified individual with a disability; (2) the defendant is a place of public accommodation (for ADA purposes) and receives federal funding (for Rehabilitation Act purposes); and (3) by reason of his disability, the defendant excluded him from participation in or denied him the benefits of the services, programs, or activities offered by the defendant, or subjected him to discrimination. 29 U.S.C. § 794(a); 42 U.S.C. § 12132; *see also Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996) ("Because the same basic standards and definitions are used under both Acts, cases interpreting either are applicable and interchangeable for purposes of our discussion.").

A plaintiff must also "prove deliberate indifference to recover compensatory damages on [his or] her ADA and Rehabilitation Act claims." *Meagley v. City of Little Rock*, 639 F.3d 384, 387 (8th Cir. 2011); *see also Roberts v. City of Omaha*, 723 F.3d 966, 975–76 (8th Cir. 2013) ("[A]ctions under the ADA and the Rehabilitation Act require proof of deliberate indifference."). "[T]o show deliberate indifference, it is enough that a plaintiff prove the defendant disregarded a 'strong likelihood' that the challenged action would 'result in a violation of federally protected rights.'" *A. J. T.*, 605 U.S. at 345 (quoting *Meagley*, 639 F.3d at 389).

It is undisputed that J.L.E. was a qualified individual with a disability, eligible for protections afforded by the Rehabilitation Act and ADA. It is also undisputed that the District is subject to the requirements of the Rehabilitation Act and ADA.[8] The dispute here concerns the third element—whether the district discriminated against J.L.E. on the basis of his disability. Elsharkawy argues that she established the third element by presenting evidence that the District failed to respond properly to bullying or harassment, failed to follow J.L.E.'s IEP, and punished J.L.E. for manifestations of his diagnosed conditions. Viewing the facts in the light most

---

[8]Elsharkawy's Rehabilitation Act and ADA claims were filed against the District only.

-11-

favorable to Elsharkawy, we conclude that she has not established a genuine dispute of material fact regarding any of these allegations.

Based on this record, a rational trier of fact could not conclude that the District "repeatedly failed to protect J.L.E. from bullying" or "punished J.L.E. for being bullied or reporting the bullying." Appellant's Br. 63. The record demonstrates that the District responded to every incident of alleged bullying for which it received notice. In each matter, the District disciplined the alleged bully or took steps to prevent future incidents. The District's disciplinary and preventative measures included phone calls to parents, after school detentions, lunch detentions, discussions with students regarding respecting each other, changed seating arrangements, bus suspensions, and increased supervision in common spaces. On one occasion, the District even referred an incident to law enforcement for criminal charges.

The District's decision to discipline J.L.E., without more, does not establish that the District punished J.L.E. for being bullied. Rather, this record shows that the District disciplined J.L.E. only for his role in each situation as it did for other students. J.L.E.'s IEP did not obligate the District to exempt J.L.E. from the same disciplinary procedures and code of conduct applicable to other students. Elsharkawy has not cited an instance where the District was aware of a bullying allegation and responded with deliberate indifference. *See S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016) ("In this case, no reasonable juror could find that the school was less than fully engaged with S.B.'s problems, using escalating disciplinary sanctions to punish and deter student-on-student harassment and taking other protective measures on S.B.'s behalf."); *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 967 (9th Cir. 2021) ("The school's response to Csutoras's harassment, which he does not challenge nor do we see any basis to second-guess, was also reasonable as it included a prompt and full investigation into the incident and suspension of the assailant."); *Long v. Murray Cnty. Sch. Dist.*, 522 F. App'x 576, 577 (11th Cir. 2013) (unpublished per curiam) ("We agree with the district court that the evidence shows a pattern on the part of Defendants of

-12-

responding promptly to reported incidents, and we agree that Plaintiffs have failed to adduce evidence that would permit a jury to reasonably find that Defendants' disciplinary responses to the reported harassment incidents were clearly unreasonable." (citation modified)).

Moreover, a rational trier of fact could not conclude that the District refused to follow, ignored, showed natural hostility toward, or took a "roadblocks approach" toward J.L.E.'s IEP. Appellant's Br. 59. Elsharkawy contends that the District did not give J.L.E. unlimited access to the bathroom or nurse, did not allow J.L.E. to wear his hood or hat, and did not permit J.L.E. to take naps during class as needed. The record evidence fails to establish conduct by the District that a reasonable factfinder could conclude reflected deliberate indifference related to J.L.E.'s IEP.

The record also does not establish that the District was deliberately indifferent towards J.L.E.'s bathroom and nurse accommodations. On one occasion, Elsharkawy proactively contacted the District about J.L.E.'s bathroom passes and was reassured that "he does have unlimited bathroom passes." Appellees' App. 196. J.L.E.'s special education teacher explained to Elsharkawy that she

> met with all of his teachers before school started and told them about his bathroom pass, and how they are unable to say no to him asking to use the bathroom. They also have copies of accommodations. I will send a reminder email to them. They also know that he can use "It's in my plan[."] Please encourage him to say this if the teacher says no. If the teacher does not know what this means, he can tell them to look at his IEP accommodations, as it is listed in there.

*Id.* at 197. J.L.E.'s special education teacher also stated that she would "send a reminder to his teachers." *Id.* at 196. The Special Education Dean sent similar reminders to J.L.E.'s teachers. *Id.* at 224 ("Good morning, teachers! I just wanted to send a quick reminder that [J.L.E.] is permitted to access the bathroom when ever [sic] needed, without delay."). On the few occasions when Elsharkawy reported that a teacher denied J.L.E. access to the bathroom, the teacher was promptly reminded

-13-

that J.L.E. should be given unrestricted access to the bathroom pursuant to his IEP and health plan. This record does not show deliberate indifference.

Nor does the record support a finding that the District was deliberately indifferent to J.L.E.'s hat or hood accommodation. Elsharkawy emailed J.L.E.'s case manager regarding a teacher's alleged noncompliance with this accommodation. The case manager responded that she reminded the teacher of J.L.E.'s IEP. The case manager explained that although the teachers receive J.L.E.'s IEP and health plan every term, J.L.E. should inform teachers that certain actions that he takes are included in his plans.[9] Elsharkawy does not contend that J.L.E. had any more issues wearing his hat or hood in that teacher's—or any teacher's—class. The allegations and asserted evidence do not permit a rational trier of fact to find deliberate indifference to J.L.E.'s IEP.[10]

Similarly, the record does not support a finding that the District ignored an accommodation permitting J.L.E. to sleep during class. In fact, the record does not indicate that J.L.E.'s IEP included such an accommodation. Instead, J.L.E. had an accommodation that permitted him to "go to the health room to rest for 20 minutes (at most)." Appellees' App. 114; *see also id.* at 220 ("[H]aving the option to rest would help him to stay awake at school."). Nonetheless, the District was not deliberately indifferent toward J.L.E.'s increased need for sleep. When J.L.E. slept

---

[9]J.L.E.'s IEP contemplated self-advocacy. For example, it states that "[J.L.E.] has been instructed to use the phrase, 'It's in my plan,' as a signal to teachers should they forget about this vital accommodation." Appellant's App. 71 (discussing J.L.E.'s bathroom accommodation). Increasing J.L.E.'s self-advocacy skills was an explicit IEP goal. *Id.* at 70.

[10]As an example of Appellant's inaccurate citations, she states that the case manager responded that J.L.E. "was only entitled to that accommodation when [J.L.E.] was 'having good behavior.'" Appellant's Br. 29 (quoting Appellant's App. 227). But that was not the case manager's response. Instead, it was Elsharkawy who stated that "[t]he [IEP] does not say he can only wear it if he is having go[o]d behavior." Appellant's App. 227.

during classes, which at one point occurred "very often" and during tests,[11] his teachers reminded him to stay awake, notified Elsharkawy of their concerns, asked if there was anything they could do to help, provided recommendations to improve his sleep, and asked Elsharkawy if she had any questions or suggestions regarding the issue. Moreover, one teacher tried to send J.L.E. to the nurse when he was asleep during class, but J.L.E. did not want to go. A reasonable factfinder could not find that the District's reaction to J.L.E. sleeping during class constituted deliberate indifference.

Lastly, a rational trier of fact could not conclude from the record that the District punished J.L.E. for behavior caused by his diagnosed conditions. Elsharkawy contends that the District punished J.L.E. by not allowing him to continue homebound instruction, initiating truancy proceedings, and denying J.L.E. art class enrollment. Her arguments are not supported by the record.

In January 2016, the District moved J.L.E. to homebound instructions "[b]ecause [J.L.E.]'s health conditions [were] preventing him from attending school." *Id.* at 93. The amendment to his plan stated that J.L.E. would receive homebound instruction "until he is able to return to school." *Id.* The District returned J.L.E. to in-person instruction after discussions with J.L.E.'s doctor. During those discussions, the doctor stated that he "wholeheartedly agree[d] that if [J.L.E.'s] health issues do not prevent him from going to school he would be best served in the school setting." Appellant's App. 135. The record demonstrates that homebound instruction was never intended to be a long-term plan. The Special Education Dean reminded Elsharkawy that the plan was to "meet every four weeks to review [J.L.E.]'s progress and the continued need for home bound instruction." Appellees' App. 122; *see also id.* at 93 ("The team will re-evaluate [J.L.E.]'s plan every four weeks to determine if homebound instruction continues to be the most appropriate placement/level of service for him.").

---

[11]Appellees' App. 215.

Elsharkawy contends that the District somehow convinced J.L.E.'s doctor to recommend a return to in-person instruction or that the District terminated homebound instruction to punish J.L.E. This allegation lacks evidentiary support and does not warrant a trial. "To survive a motion for summary judgment, the nonmoving party must substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy." *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003) (citation modified).

Furthermore, no reasonable factfinder could find that the District initiated truancy proceedings as a form of punishment. J.L.E.'s IEP did not permit unexcused absences. And it is undisputed that J.L.E. missed many days of school, several of which were not supported by a doctor's note. Even J.L.E.'s doctor "agree[d] with getting the county involved" with J.L.E.'s absences. Appellant's App. 136.

And finally, no reasonable factfinder could find that the District's decision to condition J.L.E.'s access to art class was intended to punish him. According to J.L.E.'s IEP, "it was decided that [J.L.E.] needed to show 10 consistent days of homework completion to move to Allied Arts." Appellees' App. 318. Elsharkawy was a member of J.L.E.'s IEP team. She "agree[d] with the proposal, and . . . g[a]ve permission to the school district to proceed." *Id.* at 320. The IEP team, including Elsharkawy, made the decision based on J.L.E.'s educational needs at the time. Indeed, when discussing a potential return to art class, Elsharkawy acknowledged that J.L.E. wanted to attend art class "really bad" but felt "overwhelmed" with the work he already had without art class. *Id.* at 206. The record cannot sustain a finding of deliberate indifference.

Accordingly, the district court did not err when it granted summary judgment in the District's favor on Elsharkawy's Rehabilitation Act and ADA claims.

B. *Wrongful Death*

Under Minnesota law, "[a] wrongful death claim is purely statutory, as common law recognized no such actions on the theory that a claim for personal injuries died with the victim." *Ortiz v. Gavenda*, 590 N.W.2d 119, 121 (Minn. 1999). Minnesota Statute § 573.02 permits a trustee to bring a wrongful death action on behalf of an estate "if the decedent might have maintained an action, had the decedent lived." "A plaintiff who alleges negligence in a wrongful-death action must prove that (1) the defendant had a duty, (2) the defendant breached that duty, (3) there was a death, and (4) the breach of duty caused the death." *Stuedemann v. Nose*, 713 N.W.2d 79, 83 (Minn. Ct. App. 2006).

Whether Appellees owed a legal duty to J.L.E. is a question of law. *Smits as Trustee for Short v. Park Nicollet Health Servs.*, 979 N.W.2d 436, 445 (Minn. 2022). The Minnesota Supreme Court has explained:

> A legal duty depends on the relationship of the parties and the foreseeable risk involved. No duty exists when the connection between the alleged danger created by a negligent act and the injury caused is too remote. What risk is foreseeable depends heavily on the facts and circumstances of each case.

*Id.* (citation modified). Regarding instances of suicide specifically, the Minnesota Supreme Court has stated:

> It is true that traditionally we have been reluctant to impose liability on others for self-inflicted harm. We will impose a duty to protect another person from self-inflicted harm only when the parties have a special relationship where the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare.

*Id.* at 446 (citation modified).

Here, while Appellees had a general duty to protect their students, *S.W. v. Spring Lake Park Sch. Dist. No. 16*, 592 N.W.2d 870, 874 (Minn. Ct. App. 1999), *aff'd*, 606 N.W.2d 61 (Minn. 2000), they did not owe a duty to protect against J.L.E.'s suicide on these facts. Risk foreseeability determines Appellees' legal duty. *Smits as Trustee for Short*, 979 N.W.2d at 445. As we explained above, this is a fact dependent inquiry. *Id.* Based on the record, a rational trier of fact could not conclude that Appellees could have reasonably foreseen that J.L.E. was at risk of committing suicide.

Elsharkawy contends that Appellees should have reasonably foreseen that J.L.E. would commit suicide based on alleged bullying. But the last incident of alleged bullying occurred about three months before J.L.E. committed suicide, when O.O. allegedly gave him a "death stare." R. Doc. 28-1, at 15. And before that, it had been nearly three months since the last reported incident, when O.O. punched J.L.E. Appellees were not aware of any continued issues related to bullying. Thus, they could not have been expected to foresee that J.L.E. was at risk of committing suicide based on bullying. In a similar case, *Jasperson v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, the Minnesota Court of Appeals held that the defendant could not have foreseen that a student would commit suicide. No. A06-1904, 2007 WL 3153456, at *4 (Minn. Ct. App. Oct. 30, 2007) (unpublished). There, the student committed suicide on October 4, less than two months after the last known incident of alleged bullying on September 18. *Id.* at *4–5 (holding that "the threat that J.S[.] would harm himself was not foreseeable to the school district's personnel" where, among other reasons, they did not know or have "reason to know that J.S. continued to have problems with the two boys after September 18"). *Jasperson*'s reasoning is applicable here.

Moreover, according to the record, even J.L.E.'s family and friends did not foresee that J.L.E. would commit suicide. This was true despite J.L.E.'s mentions of suicide during conversations, which Appellees were not privy to. For example, over a month before J.L.E. died, he texted a friend that he was "depressed and suicidal." Appellees' App. 2103. During their depositions, J.L.E.'s friends testified that they

did not believe that J.L.E. was actually suicidal. *See, e.g.*, *id.* at 1642 (J.L.E.'s girlfriend testifying that she "did not believe that [J.L.E.] was going to commit suicide"); *id.* at 1683 (J.L.E.'s friend testifying, "I never imagined him actually doing it," when asked about J.L.E.'s suicidal statements). J.L.E. texted Elsharkawy, who was aware of the alleged bullying, "Im [sic] going to kill myself im [sic] going to s[t]ab my self [sic] with a pencil im [sic] so f\*\*king done with bei[n]g alive," *id.* at 938, but she did not foresee that he would commit suicide, opting not to take him for psychiatric examination. The record does not suggest that Appellees were aware of any of these conversations before J.L.E.'s death.

Finally, Elsharkawy argues that Appellees should have known that J.L.E. was at risk of committing suicide based on computer searches that he made at school. In her declaration, S.K.'s mother states that counselor Malm told her that J.L.E. and S.K. had used a school computer to search for how to tie a hanging noose. She asserts that counselor Malm indicated "the school gets security notifications when students search or access inappropriate content online on school devices, and that another student had seen [J.L.E. and S.K.] searching this content together and had reported it." Appellant's App. 388. During her deposition, S.K.'s mother admitted that she did not know the name of the student that made the alleged report, when the student made the report, or to whom the report was supposedly made.

S.K.'s mother's statements do not permit a rational trier of fact to conclude that Appellees could have foreseen J.L.E.'s death for two reasons. First, it is undisputed that prior to J.L.E.'s death, the District lacked the technical capability to receive software security notifications when students searched inappropriate content. Appellees' App. 2193 (Appellees' corporate designee, Jennissen, testifying that "[i]n 2018 when [J.L.E.] was in our school, at that time there was a filter product in place. That product did filter things through email or Google Docs, but it did not filter things through internet searches or anything to that relationship."). Second, her statements are inadmissible hearsay, which is insufficient to defeat summary judgment. *See Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005). "Though parties may identify evidence at summary judgment that would be inadmissible at

trial, they must demonstrate that the evidence may be offered at trial in an admissible form." *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019). According to S.K.'s mother, counselor Malm told her about the searches. Counselor Malm, she believed, was told by a District employee who was told by one of J.L.E.'s classmates. But counselor Malm testified that she did not have any knowledge of these noose-related searches, and S.K.'s mother does not know who the student was that allegedly saw the searches. Moreover, S.K. testified that he did not recall making these searches with J.L.E. Thus, Elsharkawy has not established that she can offer evidence of the alleged computer searches in an admissible form.

Accordingly, the district court did not err when it granted summary judgment in the District's favor on Elsharkawy's wrongful death claim.

### III. *Conclusion*

For these reasons, we affirm the district court's judgment.

_____